ELIZABETH ANN HALL *vs.* THOMAS L. HALL, *et al.*— *December,* 1834.

However it may be proper as a general rule, that the court shall adopt the language of a motion for instruction as preferred by counsel, yet if this court can perceive that full and substantial justice has been done to the party, by declaring the law accurately, and in terms explicit and intelligible to the jury, *upon the points raised by counsel,* it is no ground for reversing the opinion, that such instruction were not given in the words of the motion or prayer.

S conveyed to G several tracts of land, and personal property, to be held by G in "trust for the use of S during his life; and after his death, in trust for his daughter E and her four children, share and share alike as tenants in common." Upon the death of S, the trustee went into full possession of the whole property, and soon after requested E to take possession of the farm, agreeing with her at the time, that she and her children, should eat and wear, each, her and his, fifth part of the proceeds of the property under the deed of trust; reserving to himself, G, the right at all times to manage and control all the trust property by himself and agents. Under these circumstances E with her children went upon a farm, part of

Elizabeth Ann Hall *vs.* Hall, *et al.—*1834.

the trust property :—HELD, that the right of management reserved to G, was to be exercised during E's possession ; that it did not authorise him to dispossess her at pleasure, nor depute others to do it ; but was a mere right of supervision and general direction as to the course of cultivation and general conduct of the property ; and the legal effect of this agreement was *not* to create a tenancy at will, but a tenancy from year to year on that part of the premises *only*, which was secured to the children by the deed, leaving E to the full enjoyment of her absolute right of property in *her* fifth part of the estate.

The inclination of the courts has long been against that construction of a demise, which will create an estate at will.

It is the province of the court to determine the legal effect of contracts.

Where a warrant is in due form, and commands a constable to arrest a party to give security for the peace upon complaint made, the officer who executes it, has no reason to inquire into the particulars of the complaint, or whether any were made at all. It is his duty to execute it, and in doing so legally, his justification cannot depend upon the question of whether the oath of the party who applied for it was sufficient to authorise its issue.

A constable, in the execution of a warrant to arrest a party, breaks *another's* house at his peril. If it shall prove, that the party sought for is *not* in the house, the officer is a trespasser. Even where the right of possession of the occupant in fact is controverted, the officer in such case derives no justification from it.

Before an officer, with a warrant to arrest a party, breaks the door of another person in executing his authority, he should for his justification demand entrance, and the previous knowledge of the tenant of the purpose of the officer in coming to the premises, does not dispense with this demand.

The law anxiously regards the security of a ministerial officer in serving process directed to him by a competent jurisdiction : And it may happen that a magistrate issuing a warrant, may act illegally, and subject himself to an action or prosecution, while the constable will be justified.

So where a magistrate issues a warrant to one officer, who executes and returns it, and produces the *body* of the party who is recognised or discharged, and before the return day the magistrate directs the same warrant to another officer *who without knowledge of the previous arrest*, again arrests the party, he would be justified, although the magistrate's conduct would be illegal.

Where a warrant is traced to the hands of a magistrate, who swears to its loss, parol evidence of its contents may be given as in other cases.

Appeal from *Baltimore* county court.

This was an action of *Trespass Q. C. F.*, commenced by the appellant against the appellees, on the 15th October, 1832. The defendants pleaded not guilty.

The plaintiff gave in evidence that all of the defendants came to the house of the witness, situate on the *Baltimore* and *York Turnpike Road*, and about two miles from the house and premises where the acts mentioned in the declaration were committed, at about ten o'clock on Monday night, the second day of *January*, 1832, and said, that they the defendants, were going up to *Mrs. Hall's*, the plaintiff, to take *Kilbourn*, and requested the witness, who kept a public house, to have supper ready against their return. That they the defendants returned to the house of the witness, after twelve o'clock on the same night. They said on their return, that they had been to *Mrs. Hall's* house, but that they did not find *Kilbourn*. They went and returned in sleighs. *James Blakeney*, one of the defendants, on the return of the defendants, stated, that he and defendant *Hall*, got into the house, that they gave the door a kick, and got in. That *Duncan*, one of the defendants, was a constable. And further gave in evidence by the son of the plaintiff, that the plaintiff, the witness, and the plaintiff's three youngest children, were all in the house mentioned in the declaration, on the morning of the 2d of January, 1832. That *Thomas L. Hall*, one of the defendants, came to the house the same morning, and demanded entrance; that the doors of the house were locked, or fastened, and that the mother denied him entrance, that said *Hall* then said, that to save his feelings, he would get some one to do it for him. That on the night of the same day, he and his mother were awakened out of sleep, about eleven o'clock at night, as witness thinks, by the noise and cries of persons around the house. That the witness first heard defendant, *Thomas L. Hall*, at the front door of the house, who cried out "open the door," and then began to beat on the door; witness thinks he well knew the voice of said *Hall;* that others cried "open the door;" that the back door was burst open by some one, witness supposes by *James Blakeney*, as he first entered into the house through that door, and went directly into the adjoining room, which

was the plaintiff's bed room, where his mother then was, and said, with an oath, have you got no lights here? Make haste and get a light. That *Abraham Blakeney* had a sword. That *Thomas L. Hall* snatched the key of the chamber door of said house out of plaintiff's hand, and went up stairs, and locked the said door, when he came down and locked up the plaintiff's clothes. That while they were crying and beating at the doors, and before they got into the house, the plaintiff and the witness cried murder! And that some of the persons without, cried out "yes, (with an oath) we will murder you all as soon as we get in!" Before they entered into the house, some of them threw a club against the plaintiff's bed-room window, and broke out several pains of glass. That the plaintiff and the witness were very much frightened. That *Thomas L. Hall* told the plaintiff he meant to sleep there that night, but that he had lost the chamber door key, and told the plaintiff that if she fastened up the house again, he would do the same thing again. That witness found an axe at the front door the next morning, and saw that six or seven of the palings of the fence around the house had been broken by the defendants, or some of them, in one place, and five or six in another. That the plaintiff and all her children left the house next morning by day light, and went to *Mr. Ebaugh's* house.

The defendants then read to the jury a deed, executed on the 9th of February, 1827, from *William Hall Spicer*, the father of the plaintiff, to *Mark Grafton*, of several tracts or parcels of land, and personal property, to be held by the grantee in trust for the use of the grantor, during his life, and after his death, in trust, for his daughter (the plaintiff) and her four children, share and share alike, as tenants in common. And gave in evidence by the grantee *Grafton*, that he, *Grafton*, attended to the business of said *William Hall Spicer*, the grantor in said deed of trust, before his death. That he was requested to take the deed of trust, because of the infirmity of the old man, and the habits of intemperance of his daughter, the plaintiff. That he, *Graf-*

*ton*, went into full possession of the whole of the property at the said grantor's death. That *Mrs. Hall*, the plaintiff, then being a widow, was living on the place, which had belonged to her husband, *Harry W. Hall*. That he, *Grafton*, requested her to take possession of the said trust property, a short time after her father's death, in April or May, 1829. That the object or intention of *Grafton* in placing her there was, and it was so agreed between them at the time, that she and the children should eat and wear, each, her, and his fifth part of the proceeds of the property under the deed of trust, reserving to himself the right at all times to manage and control all the trust property by himself and agents. That he, *Grafton*, left *Nehemiah Price, Edward Hall, Thomas L. Hall*, and *Mr. Morthland*, to be occasionally in attendance on the property during his absence. That *Kilbourn* went to live with *Mrs. Hall* in the spring of 1831; that he was there some time before he, *Grafton*, knew it; that he thought it was wrong, but he hoped *Kilbourn's* own good sense would induce him to leave the place; that in the latter part of December, from 29th to 30th, he, *Grafton*, was before *Walter Worthington*, a justice of the peace in *Baltimore* county, to make complaint again *Kilbourn*. That he, *Grafton*, having been informed that *Mrs. Hall* had gone to town, and that the children were not on the place, he gave the following power of attorney in the afternoon of the 31st of December, to *Thomas L. Hall*, to take possession.

"To all whom it may concern, be it known, that I do hereby constitute and appoint *Thomas L. Hall*, as my manager and agent, to act and transact for me, and in my place, in all manner of things and management of the farm and negroes, stock, plantation utensils and furniture of every kind, on the farm and plantation formerly owned by *William Hall*, alias *William Hall Spicer*, deceased, which property was by said *William Hall* conveyed to me, for the purposes and conditions therein specified and mentioned ; and I do hereby authorise the said *Thomas L. Hall* to man-

age and exercise all authority in, and on said farm, and over the negroes and property for the care taken, and management of the same, that may in his judgment be necessary, giving unto him the right of exercising the same authority that I would, or could, were I present myself. And I do hereby put him in full possession of the place, and all the property as above, so to manage for me, and for my use, subject, however, to any further or other order from me, or by me, as I may judge expedient. This power and authority to be, and remain in force until by me revoked. Witness my hand and seal, this thirty-first day December, eighteen hundred and thirty-one. M. GRAFTON, [Seal.]"

The defendants further proved by *Walter Worthington*, that as a justice of the peace, he issued a state warrant, on or about the 22d December, 1831, for the arrest of *E. G. Kilbourn*, upon the complaint of *Mark Grafton*. *That the warrant and complaint are lost, thinks they were lost in June last.* The defendants offered by said *Worthington* to give parol evidence of the contents of said complaint, which was made on oath, and reduced to writing upon the same paper with the warrant, and also parol evidence of the warrant itself. To which evidence, the plaintiff, by her counsel objected, but the court over-ruled the objection; and the said witness testified, that he thought it was on *Friday* before *Christmas*, that *Mr. Grafton* made oath that he had good cause to fear, and was afraid that a certain *E. G. Kilbourn* of *Baltimore* county, would do his person, and property, which he had in trust from *William Hall*, deceased, as by the deed of trust is expressed, certain injury, and craved the protection of the law; that on the same piece of paper, which contained the said oath reduced to writing, then followed the warrant to arrest *Kilbourn*, directed to any sworn constable, returnable forthwith, before said *Worthington*, at *Smyser's* tavern. *Kilbourn* appeared and applied for for a continuance until the 30th, when *Grafton* appeared; thinks he witness required *Kilbourn* to enter into a recognizance; does not recollect in what amount, but

thinks he told him the amount must be in proportion to the character of the offence; that *Kilbourn* did not 'enter into a recognizance; and not wishing to commit him, took his recognizance in $100, that he should appear next day a *Mallony's;* on the 31st, he, *Worthington*, appeared at *Mallony's,* and waited until he heard that *Kilbourn* and *Mrs. Hall* had gone to town; that afterwards on the second or fourth of January following, after the meeting at *Mallony's,* that said warrant which had been returned by *Adam Sharer* on the 30th December, 1831, when *Kilbourn* appeared as above mentioned, was altered, so that it was directed to —————— *Duncan,* or any sworn constable, and without any other alteration, it was delivered to defendant, *Thomas L. Hall;* that two or three days after the alleged trespass, he *Worthington,* went upon the place to value the property; that he particularly examined the property to see what injury had been done; as he had heard that considerable injury had 'been done; that he did not examine the palings, nor the windows; that he delivered the said warrant, when it first issued, to *Mark Grafton,* and it was then addressed to any sworn constable; that he was applied to by *Thomas L. Hall,* to go to the place to appraise the property, could not see any glass broken in the bed room; there was no return day in the warrant as it first issued—it was returnable forthwith. Said *Worthington* further testified, that his recollection, respecting the oath of *Grafton* first made before him, may not be as distinct as he could wish; that when he was going on, administering the oath, when he came to the part expressing his, (*Grafton's*) fear to his person, that *Grafton* stopped him, and objected, but afterwards thinks, upon some remarks made by him, witness, that he consented to include, fear of his person, and he distinctly recollects, that he did make oath to his personal fear.

The plaintiff then gave in evidence by *Elbridge G. Kilbourn,* that a day or two before the 29th December, 1831, *Adam Sharer,* constable, served upon him, *Kilbourn,* a warrant, requiring him, the said *Sharer,* to have him, *Kilbourn,*

before *Walter Worthington*, at *Smyser's* tavern, on the 29th December; that he, *Kilbourn*, wrote a copy of the complaint, which preceded the said warrant, and which was on the same paper—that the following is the copy of said complaint, in his own hand writing, and comprises all that he wrote.

(Copy.) State of *Maryland, Baltimore* county, sc.

Whereas, *Mark Grafton* has, this 23d day of December, 1831, appeared before me, the subscriber, a justice of the peace for *Baltimore* county, and made oath on the Holy Evangels of Almighty God, that he has great reason to fear and is afraid, that a certain *E. G. Kilbourn*, of *Baltimore* county, will do his property, which he had in trust from *William Hall*, deceased, for the purposes, as by said trust is expressed, certain damages and injury, contrary to the peace, and good order, and dignity of the state of *Maryland,* and therefore prays the protection of the law.

*W. Worthington.*

To *Adam Sharer,* constable.

That he wrote in haste, but believes he made an exact copy of the original as far as he wrote, except that he thinks, that the name of *Walter Worthington,* was signed in full; that he and the constable, *Sharer,* who was present when witness made the copy, compared it with the original after it was made, and found it correct; that witness afterwards heard the original read over by *Walter Worthington,* or when witness appeared before him on said warrant. That witness does well recollect the substance of the original warrant, and the complaint therein recited, independently of the said copy, and he is confident that there was not in the orignal, any thing expressed about *Grafton's* fear to his person, but only to the property which he held in trust from *William Hall.*

He further proved, that *Grafton* agreed with the plaintiff, that she should continue to hold the farm and trust property of which she was then in possession, for *five* years from the 21st of April, 1831, for the use and support of herself and and children.

The plaintiff, further to support the issue on her part, gave in evidence by *Adam Sharer*, a witness, that he as constable had a warrant issued by *Walter Worthington*, for the arrest of *E. G. Kilbourn*. That said warrant was dated on or about the 23d of December, 1831, was directed to him, *Adam Sharer*, by name, and made returnable before *Walter Worthington* on the 29th of the same month, at *Smyser's* tavern; that when he served said warrant on *Kilbourn*, he, *Kilbourn*, requested a copy thereof, and that he, *Sharer*, saw the copy when it was made, (being the same mentioned in the testimony of *Kilbourn*) and compared it with the original with *Kilbourn*. That he believes it to be a true copy as far as it goes. That he is confident there was not in the complaint on the warrant any thing about the fear of *Grafton* to his person. That this circumstance, and also the circumstance of the warrant having a return day, and its being made returnable specially before *Walter Worthington*, are reasons why he recollects the contents of said warrant. That *Kilbourn* appeared at *Smyser's* on the 29th of December, 1831, the return day of the warrant, but Mr. *Worthington* was not there. That on the next day, the 30th, Mr. *Worthington* was at *Smyser's*, with *Grafton* and others. That *Worthington* sent for him, *Sharer*, and enquired where the warrant was, and *Kilbourn;* that he, *Sharer*, told him the warrant was returnable on the 29th, and that *Kilbourn* had appeared on that day at *Smyser's*. That *Worthington* at first denied it was returnable on the 29th, but admitted his mistake when the warrant was produced. That he, *Worthington*, then wrote on the back of the warrant, "continued until the 30th, returnable forthwith," and gave it to witness, and requested him to go and bring *Kilbourn* on the warrant, which witness did, he, *Kilbourn*, making no objection to going; that *Kilbourn* appeared before *Worthington*, who read the warrant over to him, and demanded of *Kilbourn*, to enter into a recognizance to the amount of $2400, with securities, which *Kilbourn* would not do.

Upon the whole evidence, the plaintiff, by her counsel, prays the opinion and instruction of the court to the jury as follows.

1st. If the jury believe that *Mrs. Hall*, the plaintiff, was in the actual possession of the house and premises, upon which the acts were committed by the defendants as given in evidence, and at the time when they were committed, then such possession is sufficient in law, to entitle the plaintiff to maintain this action, notwithstanding the deed of trust from *William Hall* (otherwise called *William Hall Spicer*,) to *Mark Grafton.*

2d. That the paper purporting to be a power of attorney from *Mark Grafton* to *Thomas L. Hall*, dated the 31st December, 1831, did not authorise the said *Hall*, or any of the defendants to commmit the acts complained of in the declaration in this cause, or of which evidence has been given to the jury, and that said paper is not a justification of those acts.

3d. If the jury believe that the warrant, or paper, which the defendant, *Duncan*, had for the arrest of *Kilbourn*, (if they find he had any in fact) on the night of the 2d of January, 1832, when the house occupied by the plaintiff was broken, &c., as stated in the evidence by the defendants, was the same warrant, or paper, which had been issued by *Walter Worthington*, upon the complaint of *Mark Grafton*, made on or about the 23d December, 1831, and if they believe that the tenor or substance of said complaint, as reduced to writing by said *Worthington*, upon said warrant, or upon the paper containing, or prefixed to said warrant, was as stated in *E. G. Kilbourn's* evidence, that then the said warrant was not a legal warrant, to authorise the said *Duncan*, or any other officer or person to arrest the said *Kilbourn*, and therefore it is no justification of any of the defendants, of the acts complained of in the declaration in this cause, or given in evidence to the jury.

4th. That if the jury should believe, that on the night of the 2d January, 1832, when the house occupied by the

plaintiff, was broken and entered by the defendants as stated in the evidence, the defendant *Duncan*, had a legal warrant for the arrest of *Kilbourn*, for an alleged breach of the peace, yet if the jury find from the evidence, that said *Kilbourn* was not in fact, in the said house at the time when it was broken, &c., on that night, then the defendants were not, and are not justified by virtue of said warrant, in breaking or entering the house, or in committing any of the acts complained of in the declaration in this cause.

5th. That although the defendant *Duncan*, had a legal warrant for arresting *Kilbourn*, for an alleged breach of the peace, at the time when defendants broke and entered the house occupied by plaintiff, as stated in the evidence, yet that such warrant does not justify the defendants, if the jury believe that they broke and entered the house at a late and unreasonable hour of the night, and without having first made known their business to the occupants within the house, and demanded entrance for the purpose of serving or executing said warrant.

6th. That although said defendant *Duncan*, had a legal warrant for arresting *Kilbourn*, for an alleged breach of the peace, at the time when the defendants broke and entered the house occupied by the plaintiff, as stated in the evidence, yet that such warrant does not justify the defendants, if the jury believe that they broke palings around the house, or broke the windows of the room in which Mrs. *Hall*, the plaintiff slept, or threatened before they entered, that they would murder all the persons in the house when they should get into it, or used profane or abusive language to her after they, or some of them, had broken and entered the house, or took from her by force the key of the chamber of said house, or locked the door of said chamber, or locked up her clothing or other goods, and carried off, lost, or kept the key after having locked up the said chamber, or threatened to break the house, and commit the like acts again, if she, the plaintiff, locked or fastened the outer doors of the house after the defendants should have gone out of it, be-

cause such acts were unnecessary to the lawful execution of such warrant, even if *Kilbourn* had been in the house, and because such acts were an abuse of the authority granted by such warrant, and if committed by defendants, they were trespassers, notwithstanding such warrant might have been in all respects, regular, legal, and valid.

7th. That the deed of trust from *William Hall Spicer* to *Mark Grafton*, offered in evidence, conferred no right upon *Grafton*, or any other person acting under his authority, forcibly to enter the dwelling house and premises mentioned in said deed, and to dispossess the plaintiff of the possession of any part of the trust property named in said deed, and that if the jury shall believe that the plaintiff was in the possession of the trust property, either by the agreement of the trustee, or by his permission, for the purpose of cultivating the farm, and of obtaining support for herself and family, from the proceeds and use thereof, that then such possession was lawful, and neither *Grafton* himself, nor any one acting under his authority, derive any right under said deed to interrupt the same.

8th. If the jury believe from the evidence, that the plaintiff was put in possession of the trust property by *Grafton*, and continued therein by his approbation, from year to year, that then she occupied the premises, from year to year, and it was not competent for said *Grafton* to terminate her possession, without six months previous notice to remove.

9th. That if the jury from the evidence believe, that *Thomas L. Hall* did enter into said premises in possession of the plaintiff, by virtue of the power of attorney from *Mark Grafton*, offered in evidence, while the plaintiff was in possession of the same, yet if they also believe from the evidence, that the said *Hall* left the premises, and during his absence the plaintiff also went away for the transaction of her business, with the intention of returning, leaving all her goods, furniture, servants and other property in the premises, and that she did return on the next day, and uninterruptedly enter into possession thereof, and that she contin-

ued,' and was in possession at the time the trespass complained of was committed, that such absence was not an abandonment in law of her possession or right of possession, so as to preclude her from maintaining this action against the defendants.

10th. The deed of trust from *William Hall Spicer* to *Mark Grafton*, being the only evidence now offered to the jury, which confers any right upon the said *Grafton*, in relation to the trust property, mentioned in said deed, that the testimony of said *Grafton* is wholly inadmissible to prove any right in himself, or his agents, to interfere with the use and possession of said property, contrary to the terms and conditions of said deed.

11th. That if the jury believe from the evidence, that the warrant issued by *Walter Worthington*, against *E. G. Kilbourn*, upon the complaint of *Mark Grafton*, was served upon *Kilbourn* by the constable *Sharer*, and was returned by *Sharer* to the justice, together with the body of *Kilbourn*, and that the said justice took the recognizance of said *Kilbourn*, to appear before him at a subsequent day, to enter into security to keep the peace upon said complaint, that then such warrant was *functus officio* and could not again be re-issued to another officer, to arrest the defendant, but the remedy to bring him again before the magistrate, on his failure to appear at such subsequent day, is upon his recognizance.

12th. *Walter Worthington*, a witness on the part of the defendants, while under examination, having testified that the original warrant, and the complaint on oath of *Mark Grafton*, on which said warrant was issued by said *Worthington*, as a justice of the peace, in the name of the *State of Maryland*, against *E. G. Kilbourn*, that he should give a recognizance to keep the peace, was last in his possession, and was lost. The defendants, by their counsel, then offered to prove the contents of said warrant and complaint, by the oral testimony of said *Worthington;* to which testimony the plaintiff objected as incompetent in law for the pur-

pose; which objection the court overruled, and admitted the evidence of said *Worthington.* All which prayers and instructions were refused by the court, (ARCHER, Ch. J.)

But the court granted the plaintiff's seventh prayer, with the following modification, to wit: "Unless the jury should believe that by the agreement with *Mrs. Hall, Grafton* gave her liberty to occupy the house and property at his will; but if the jury should believe that subsequently an agreement was made, such as is proven by *Kilbourn,* then the said *Hall* or *Grafton* had no right to enter upon or take possession of the premises."

And the court granted the plaintiff's eighth prayer, with the following modification and addition: "Which prayer was granted by the court with this explanation to the jury, that if they believe the testimony of *Kilbourn,* then there existed such a relation of landlord and tenant, as prevented *Grafton,* or any one acting under his authority, from terminating her possession without legal notice. But if the jury believe that *Mrs. Hall* made no other agreement, in relation to the occupation of the premises, than that which *Grafton* swears to, then he could terminate all the possessory right of *Mrs. Hall* by an entry, with the view to occupy the premises without notice, and further declared to the jury, that there was no other evidence of any agreement with *Grafton* for the occupation of the premises, than that which is sworn to by *Grafton* and *Kilbourn.*

And the court granted the plaintiff's ninth prayer, with the following modifications and additions: "Which instruction the court gave to the jury, but further instructed the jury, that although her leaving the premises, under the circumstances in this prayer mentioned, if they should be found by the jury, would be no abandonment in law, of any possessory right she may have had in the property, yet if the jury believe that *Thomas L. Hall,* previous to the time of her departure, had taken possession of the property under the power from *Mark Grafton,* and had not abandoned the possession, if it should have been thus acquired,

then all her possessory rights had terminated, as regards the defendant *Thomas L. Hall*, and all who subsequently entered by his approbation or consent, if the jury should believe that the plaintiff occupied the premises at the time of such supposed entry, under no other agreement than that proved by *Mark Grafton.*"

And the court gave to the jury the following instructions and directions: 1st. If the jury believe that the defendant *Hall*, entered into possession of the premises, upon which the trespass is alleged to have been committed, by the authority of *Mark Grafton*, the trustee under the deed from *William Hall Spicer* to him, and if the jury should believe from the evidence, that the plaintiff by agreement with *Grafton*, occupied the house and premises at the will of *Mark Grafton*, then the plaintiff is not entitled to recover against the said *Hall*.

2d. But if the jury should believe that the plaintiff, by agreement with *Mark Grafton*, was allowed to occupy and possess the premises, according to the evidence of *Kilbourn*, then neither *Grafton* nor *Hall*, acting under him, could have any right to enter into possession of the premises while the plaintiff occupied the same under such agreement; and if the jury should find such entry, then the same would on his part, be a trespass, for which he would be liable in damages to the plaintiff.

3d. If the jury should believe that a warrant was issued to arrest *Kilbourn*, that he might give surety to keep the peace, although the complaint as spread on the face of the warrant is defective, yet if the jury believe that an oath was made by *Grafton*, upon which it was grounded, that he was fearful of damage to his person, and should also find, that *Duncan*, one of the defendants, acted as constable to serve said warrant, and that the other defendants were summoned by him to assist in the service of the warrant, and that the acts complained of were only such as were peaceful and necessary in their efforts to execute it, and were unaccompanied with violence, either to the person or property

of the plaintiff, then the said last mentioned defendants cannot be found guilty of a trespass, although the said *Kilbourn* was not in the house of the plaintiff, or was not found by the said defendants at the time of said trespass. But if the jury should believe, that the last named defendants having to execute the said warrant, were guilty of violence either to the person or property of the plaintiff, in their efforts to serve the warrant, or that they broke open the doors of the plaintiff's house, and that she, and not *Thomas L. Hall*, was in possession thereof, without first demanding an entrance for the purpose called for by the warrant, or unless the plaintiff knew the purpose for which they came, to wit, to serve the warrant, then the said defendants are trespassers, and liable to the plaintiff in damages.

4. If the jury should believe that violence was used in the service of said warrant, or that the defendants entered without demand into the house where the plaintiff was, and that the plaintiff did not know the purpose for which they came, to wit, for serving the warrant on *Kilbourn*, still, whether the plaintiff can recover damages in this case, must depend upon the fact, whether *Mrs. Hall* had possession; for if *Thomas L. Hall* had possession, and the other defendants entered with his approbation, they cannot be guilty of a trespass.

To these opinions and instructions, with the modifications and additions of the court, to the plaintiff's 7th, 8th and 9th prayers, the plaintiff excepted, and the verdict and judgment being for the defendants, the plaintiff brought the record upon appeal before this court.

The cause was argued before BUCHANAN, Ch. J., and STEPHEN and CHAMBERS, J's.

*Hinkley*, for the appellant.

1. The plaintiff had a sufficient possessory title to support the action. She was at the least a tenant from year to year, and not a tenant at will, and was entitled to six months

notice to quit. 1 *Cruise Dig.* 191. 3 *Durnf. and East.* 4, 13. 8 *Term.* 3, 6. 3 *Burr*, 1609. 1 *Johns.* 322. But if a mere tenant at will, still she was entitled to a notice of six months, or at all events, to a reasonable notice. 1 *Cruise*, 191, *sec.* 19. 3 *Wilson*, 25. 1 *Pick. Rep.* 43, 49. 13 *East.* 210. 9 *Johns. Rep.* 209. 1 *Ib.* 322. 2 *Ib.* 75.

2. The warrant mentioned in the appellant's *third* prayer, was not sufficient to authorise the arrest of *Kilbourn*, and is no justification for the acts complained of. The oath upon which the warrant was founded, should have appeared upon its face, and could be proved in no other way. 2 *Strange*, 1002. 1 *Bac. Abr. title (Constable)* 690. 2 *Stark. Ev.* 817. 13 *Massa. Rep.* 286, 289. 4 *Burns' Justice*, 225, 227. 2 *Hawkins*, 5, 12 and 111.

3. But if the warrant was sufficient to justify the conduct of the defendants, in case *Kilbourn* had been in the house, it could not justify them in his absence; and the risk of his not being there was assumed by them. 1 *Hale*, 117.

4. The previous service of the same warrant by another officer, rendered it *functus officio*, and for that reason it could furnish no justification to the defendants, though the officer originally charged with its service, might legally have committed the acts complained of. 2 *Hale*, 120. 1 *Burns*, 102.

5. The power of attorney from *Grafton* to the defendants did not authorise them to proceed in the manner charged against them; nor was *Grafton* a competent witness to prove a right in himself or his agents, to interfere with the plaintiff's possession.

*Johnson*, for the appellees.

A tenancy at will, or at sufferance, may be created by the express terms of the parties, and according to the evidence of *Grafton*, such was the character of the tenancy of the plaintiff. 1 *Chitty Genl. Pr.* 256. 4 *Taunt.* 128. 5 *Barn. and Ald.* 604. And the instruction of the court to the jury was, that they should so find, if they believed *Grafton*.

The reservation of rent does not convert a tenancy at will, into a more permanent estate, if the parties by express stipulation so contract, and in such case no notice to quit is necessary. 1 *Pick.* 48. 2 *Wheat. Selw.* 531.

When *Grafton* reserved the right to manage and control the estate, he necessarily reserved the right to take possession of it, without which, the authority to control and manage could not be exerted. The authority conferred by him upon *Hall*, the defendant, was a legitimate exercise of this power. It was an authority to manage the estate for *Grafton*, and not to turn *Mrs. Hall* out of possession, and his right to do this latter act, therefore, is not the question to be decided. To have abandoned the estate wholly to the management of the plaintiff would have been a breach of trust.

2. If the warrant for the apprehension of *Kilbourn* was a valid one, it furnishes a full justification for the appellees, all of whom were summoned by the officer charged with the execution of it. Whether it was valid or not, depends upon whether the magistrate who issued it had jurisdiction over the subject. If he had, the form of the proceeding is altogether immaterial. *Grafton's* affidavit of personal danger gave the jurisdiction, and authorised the magistrate to issue the warrant; and there is no authority for saying that it should disclose upon its face the proof upon which it issued. 1 *Chitty Cr. L.* 27, 41. *Bac. Abr. Trespass, D.* 3.

The legal presumption is, that the warrant was in conformity with the evidence before the magistrate. If trespass can be maintained against the officer for serving this warrant, it may be likewise, against the magistrate who issued it, and *Grafton* who procured it to be issued.

It has been said that the warrant was *functus officio* after the return day, and the previous service of it by another officer. If, however, it was good upon its face, and the officer who had it, and those who aided him, were not aware of the misconduct, or mistake of the justice who issued it, they must surely be protected, and such is the instruction

of the court.   If a different rule prevailed, and ministerial officers charged with the service of process, and their assistants, were responsible for the mistakes of judges and justices, no man would be found willing to execute the laws.

The question of violence, was for the jury, and was properly submitted by the court to them.   If the defendants had reason to believe that *Kilbourn* was in the house, they were justified in forcing their way in.

CHAMBERS, J., delivered the opinion of the court.

At the trial of this case the plaintiff's counsel made twelve points, upon which the court was asked to instruct the jury. They were all rejected.

The court then instructed the jury upon the *seventh*, *eighth* and *ninth* points, modifying the prayer of the plaintiff as is particularly stated in the exception, and then further instructed the jury in their own terms on several of the questions arising in the cause.

However, it may be proper as a general rule, that the court shall adopt the language of a motion for instruction as preferred by counsel, yet if this court can perceive that full and substantial justice has been done to the party, by declaring the law accurately, and in terms explicit and intelligible to the jury, upon the points raised by the counsel, it is no ground for reversing the opinion that such instructions were not given in the words of the motion or prayer. It is sufficient that other language was employed by the court less subject to misconception, or that the prayer was gratified with such accompanying explanations as were necessary for a full and fair comprehension of the law.

The exception professes to set out all the testimony in the cause, and the instructions were asked "upon the whole evidence."

The first instruction moved for, it has been said in argument, was intended to raise the question whether the agreement as proved by *Grafton*, between the plaintiff and himself, constituted the plaintiff a tenant at will, or tenant from

year to year, of the house and farm on which the trespass is alleged to have been committed. We do not perceive that the prayer did raise this question. It calls upon the court to say to the jury, that if the plaintiff was in actual possession of the house and premises, then such possession was sufficient to entitle the plaintiff to maintain her action. It did not assume that any of the evidence relating to a trespass was to be believed, that any act of violence against that possession, or that any specific wrong, was perpetrated. The words "upon which the acts were committed by defendants, as given in evidence," are used, but they are used as descriptive of the house and premises, and are the only words used to identify the *locus in quo*. The jury might believe the plaintiff to have been in possession, and yet not believe the witnesses who gave evidence of the trespass. It was therefore in effect to ask the court to say that the trespass was sufficiently proved, if the jury believed the plaintiff to have been in possession of the premises, which the court properly refused to do.

The court, however, after rejecting the prayer, do instruct the jury, that if they believe that the plaintiff made no other agreement, in relation to the occupation of the premises, than that which *Grafton* swears to, then he could terminate all the possessory right of the plaintiff by an entry with the view to occupy the premises without notice, and also, "that if the defendant, *Hall*, entered into possession of the premises by the authority of *Grafton*, and that the plaintiff, by agreement with *Grafton* occupied the house and premises at the will of *Grafton*, then the plaintiff is not entitled to recover against *Hall*"—And again they say, "if *Grafton* made no other agreement than that which he proves, and the defendant, *Hall*, had authority from *Grafton*, his first entry is no trespass; and having thus taken possession, his *second* entry is justified unless he abandoned the possession between the time of the first and second entry." They proceed to say in their subsequent instructions, in regard to the defence taken by those defendants

who justified under *Hall's* authority, that it must "depend upon the fact whether *Hall* has made out his justification that he was in possession under authority from *Grafton.*" These opinions are grounded we think in a misconception of the nature of the tenancy of the plaintiff, and of the effect of the agreement between *Grafton* and the plaintiff, as sworn to by *Grafton.*

The inclination of the courts has long been against that construction of a demise which will create an estate at will. The interests of agriculture, and the importance to lessees of land, of certainty and security in their occupation, are opposed to such estates, and they scarcely, if at all, exist in fact. We do not think the circumstances of this case, or the intention of the parties justify such an interpretation of the relations existing between them.

*Grafton* took possession of the premises, as trustee under the deed. He put the plaintiff in possession, entitled to the fee simple interest in one undivided fifth part, of which she could dispose at her will and pleasure. There are no rights of control or management reserved by the deed to *Grafton*, no authority to remove her from the possession of the portion secured to her after the death of her father.

The consideration of the deed is the natural love, and affection which the grantor had for his daughter, the plaintiff, and her children. The object avowed in the deed is to make provision for them after his decease, and the means adopted is to convey to *Grafton*, in trust, to permit the grantor during his life, to take the rents and profits, and after his decease, in trust for the plaintiff and her four children, by name, and their heirs, as tenants in common, without an intimation that *Grafton* is to interpose the slightest obstacle to the complete enjoyment of the property, or the possession of it by them. Assuming then that the case is not within the statute of *Henry VIII.* and the use not executed—upon which subject we do not intend to decide—there is nothing to prevent the full and entire enjoyment of one-fifth part of the premises by the plaintiff, under the

deed, unless she has contracted to part with her interest and property in it.

To ascertain whether she did so contract with *Grafton*, it may be proper to consider the circumstances under which his agreement with the plaintiff was made. He was the guardian of the children, and their trustee. By the terms of the agreement, she was to clothe and feed the children ; she was to lease the other farm on which she was residing, and to occupy these premises "with the object and intention expressed at the time, that she and the children should eat, and wear each his, and her fifth part of the proceeds of the property." She took possession of the premises in April or May, 1829, and continued to reside upon, and cultivate it to the time of the alleged trespass, and nothing is stated to shew that she did not feed and clothe the children. The right reserved by *Grafton* was "at all times to manage and control the trust property by himself and agents."

We think it clear this right of management and control was to be exercised during the plaintiff's possession, and that it was not a right to dispossess her at pleasure, but a right of supervision and general direction as to the course of cultivation, and general conduct of the property. The obligation to furnish food and clothing for her children, was one of daily expense ; many months must elapse from the period when she took possession, before the farm could yield a crop of any kind. Could she have intended to subject herself to be removed at any moment, after pitching a crop, and cultivating it, and before it should be harvested, at any any season of the year, at any hour of the day or night. It would be, we think, in direct violation of the intention avowed, as *Grafton* swears, at the time of the agreement. He acted in reference to some supposed rights vested in him as trustee, to superintend the property, but could not be authorised by any thing in the agreement, to go or send an agent at midnight to break open the doors, destroy the windows, injure the enclosures, and lock up the clothes of the plaintiff, and treat her with rudeness. These are acts

sworn to have been committed by the defendants, and as it was not possible for the court to ascertain whether the jury could, or would not give credit to the witness, who testified to them, they must be regarded as a part of the case in reference to which the court have said the plaintiff cannot recover in the case assumed in their instructions.

It is the province of the court to determine the legal effect of contracts, and we think in this case, the legal effect of the agreement sworn to by *Grafton*, as made between himself and the plaintiff, taken in connexion with the deed of trust, was not to create a tenancy at will, as the court have assumed, as the foundation of the several opinions we have referred to—but a tenancy from year to year, in that part of the premises which was secured to the children by the deed, leaving the plaintiff in the full enjoyment of her absolute right of property in her fifth part.

The second point upon which the plaintiff asked the instruction of the court was, "that the paper purporting to be a power of attorney from *Grafton* to *Hall* did not authorise any of the defendants to commit the acts complained of in the declaration, or of which evidence has been given to the jury."

Considering the expressions, "acts complained of in the declaration, or of which evidence has been given," to be understood as referring to the acts of violence and injury to the premises, and the insult to the person of the plaintiff sworn to by the plaintiff's witnesses, we have disposed of this question by what has been already said, from which it follows that the court erred in not giving the instruction.

The third point relates to the warrant issued by the magistrate against *Kilbourn*.

The prayer is that if the jury believe the tenor or substance of the complaint as reduced to writing upon said warrant, or upon the paper containing or prefixed to said warrant, was as follows, then setting out in *hæc verba* the affidavit on which the warrant issued, that then the warrant was not a legal warrant, and would not justify the defend-

ants. This application manifestly and erroneously assumes that the regularity of the complaint, which is the oath of the person at whose instance the warrant issues, must determine the authority of the officer who executes the warrant.

Now if the warrant were in due form, that is, if it commanded the constable to arrest the party, to give security for the peace upon complaint made, the officer who executed it had no reason to inquire what were the particulars of the complaint, or whether any were made at all. It was his duty to execute the warrant, because upon its face it disclosed a case of which the magistrate could take cognizance. The warrant is not set out in the evidence, and therefore this court cannot express an opinion upon its sufficiency, but we think the court properly rejected the prayer to declare the warrant illegal, and not sufficient to justify the constable, solely because the complaint was not such as to justify the magistrate in issuing it.

The *fourth* prayer assumed the legality of the warrant, and asked the court to instruct the jury that it did not authorise the constable and his assistants to break the door of plaintiff's house, if *Kilbourn* was not then in the house. This instruction we think ought to have been given. The court in their subsequent instructions, make this question to depend upon the nature of the plaintiff's possession.

The defendants justified upon two grounds, one the right of possession, derived under the deed and agreement between *Grafton* and the plaintiff,—the other, the authority to enter upon the premises, and arrest *Kilbourn* under the warrant. The plaintiff in this prayer appears to have sought from the court an opinion as to the authority of the constable to break the door of the house occupied at the time by the plaintiff as her dwelling, in his pursuit of *Kilbourn*, against whom the warrant was directed. The constable in execution of a warrant to arrest a party, breaks another's house at his peril. If it shall prove that the party is not in the house, the officer is a trespasser. If Mrs. *Hall* was

actually occupying the house at the time with her family, it was to this purpose her castle, and whatever controverted rights of possession there might be in relation to it, the officer derived no justification from that circumstance. We think the court should have so instructed the jury, as not to make the authority of the constable, under the warrant, dependent upon the collateral fact of possession.

The *fifth* point made by the plaintiff was, that before the defendants could be justified in breaking the door in executing the warrant, the constable should have demanded entrance. We think this instruction should have been given as prayed, and we do not concur in the qualification afterwards given by the court, which excused the demand, if *Mrs. Hall* knew the purpose for which they came.

The *sixth* point relates also to the manner of executing the warrant.

Although the prayer does not distinctly assume as a preliminary hypothesis, that the jury should believe the plaintiff to have been in possession, yet as the whole evidence is referred to in the introductory part of the exception, and there does not appear to have been any conflict in the testimony upon that fact, we feel bound to consider it as implied. The court in their instructions upon this subject, have united its consideration with various other matters. It is clear that a legal warrant would not have authorized the officer charged with its execution to commit the acts enumerated in the prayer, and we think the court should distinctly have said so to the jury, and that if *Kilbourn* was not in the house, the breaking open the door was not justified, although it may have been done with as little mischief or inconvenience as possible to the plaintiff.

The *seventh* instruction prayed for was that the deed of trust conferred no right on *Grafton*, or any one acting under his authority, to dispossess the plaintiff of the trust property, if the jury believed the plaintiff was in possession either by the agreement of *Grafton*, or by his permission, &c.

We have before expressed the opinion, that under the circumstances of this case the plaintiff had an absolute interest in one undivided fifth part of the premises, and was tenant from year to year, of the residue, and that *Grafton* had no authority in person, or by agent, to enter and dispossess the plaintiff at pleasure.

We cannot therefore concur in the modification of this prayer made by the court. It follows in like manner, from what has been said, that the *eighth* instruction should have been given, as prayed, without the modification.

The *ninth* instruction moved for by plaintiff relates to the re-entry of *Hall* the defendant, after a previous entry, which is assumed to have been lawful.

In the view taken by this court, no such legal effect would ensue from the first entry of *Hall*, the defendant, as to dispossess the plaintiff.

If *Hall*, the defendant, did take possession in fact adversely to the possession of the plaintiff, and in her absence, he was a trespasser; and if the plaintiff afterwards returned to the premises, and finding them unoccupied by *Hall*, quietly repossessed herself of them, the defendant, *Hall*, could derive no sanction for a second entry, from the fact of his having previously entered. If the entries were made for the purpose of disturbing the plaintiff's enjoyment of the property, or in a violent manner, or for any other purpose than to discharge the right of supervision reserved by *Grafton's* contract, it was not in pursuance of any authority given either by the deed or the agreement. We do not concur, therefore, in the modification of the court to the *ninth* prayer. The *tenth* point has been abandoned by the appellant's counsel.

The *eleventh* prayer asked the court to say, that if the jury believed the warrant to have been received and served by *Sharer*, and returned by the magistrate, and that *Kilbourn* had been produced before the magistrate who had " taken his recognizance, then the warrant was *functus officio*, and could not again be re-issued."

{\ The law anxiously regards the security of a ministerial officer in serving process directed to him by a competent jurisdiction.   It may well happen that a magistrate issuing a warrant may act illegally and subject himself to an action or to a prosecution, while the constable executing the warrant illegally issued, will be justified.   The evidence is contradictory, in regard to the return day in the warrant in this case.   The magistrate swears there was no day of the month named in it as the return day, but that it was returnable forthwith.   If a warrant be issued by a magistrate and delivered to a constable who executes and returns it, and produces the body of the party who is recognized or discharged, and before the return day the magistrate directs the same warrant to another constable, who without knowledge of the previous arrest, again arrests the party, we think he would be justified, although the magistrate's conduct would be illegal.   The plaintiff, in stating the case upon which the prayer is founded, does not enumerate the circumstances under which the warrant was re-issued, except only that it had been previously issued, and served by another constable, and that the party had been taken and recognized.   These particular facts might exist, and yet other circumstances might also exist, which would justify the second officer who executed the warrant, and we think the motion was properly refused.   The *twelfth* instruction was asked upon the ground that parol evidence could not be given of the warrant.   It was traced to the hands of the magistrate who proved its loss, and we can discover no ground of distinction between this case, and the every day case of a lost paper, and therefore concur in the opinion which rejected this application.

JUDGMENT REVERSED, AND PROCEDENDO AWARDED.